2008-NMCA-131

193 P.3d 587

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Mario PACHECO, Defendant–Appellant.**

**Nos. 26,721, 26,739.**

Court of Appeals of New Mexico.

Aug. 14, 2008.

Gary K. King, Attorney General, Katherine Zinn, Assistant Attorney General, Santa Fe, NM, for Appellee.

James E. Bierly, Albuquerque, NM, for Appellant.

## OPINION

SUTIN, Chief Judge.

{1} Defendant Mario Pacheco, a vehicle passenger, appeals his convictions for possession of methamphetamine with intent to distribute and for conspiracy. The police discovered the drugs upon searching a compartment hidden near stereo equipment that replaced the vehicle's back seat. Defendant raises four issues on appeal, challenging: (1) the denial of a motion to suppress evidence seized in the course of a traffic stop; (2) the district court's response to the State's destruction of evidence; (3) the exclusion of evidence that the driver absconded and was the subject of a bench warrant; and (4) the sufficiency of the evidence to support Defen-

dant's convictions. We address all of these issues and reverse the exclusion of evidence that the driver absconded. We also determine that there was sufficient evidence to permit retrial of Defendant.

**MOTION TO SUPPRESS**

{2} Law enforcement officers discovered significant quantities of methamphetamine in a vehicle in which Defendant was traveling. Defendant moved to suppress this evidence on grounds that the detention and search of the vehicle were improper. The district court denied the motion. Defendant challenges this ruling on appeal.

**Standard of Review**

{3} When reviewing a ruling on a motion to suppress, "we observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto*, 2000–NMSC–031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (internal quotation marks and citation omitted). We view the facts in the light most favorable to the State as the prevailing party, indulging all reasonable inferences in support of the district court's ruling and disregarding all evidence and inferences to the contrary. *State v. Urioste*, 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964; *State v. Jason L.*, 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We review the application of the law to those facts de novo. *State v. Ochoa*, 2004–NMSC–023, ¶ 5, 135 N.M. 781, 93 P.3d 1286.

**Suppression Hearing: Facts**

{4} On the afternoon of February 14, 2002, Deputy Roth observed a small, red Mazda traveling at approximately eighty-five miles per hour in a seventy-five mile-per-hour zone, and he initiated a traffic stop. As he approached the passenger side of the vehicle, the officer noticed a heavy odor of air freshener, heavy perfume, or after shave. The deputy asked the driver for his license and registration. The driver presented an identification card, but could not produce a driver's license. The deputy noticed the driver's hand was visibly trembling, and he appeared to be uncommonly nervous. Defendant, who was seated in the passenger seat, assisted in producing the vehicle registration from the glove compartment.

{5} Noticing that the name of the registered owner did not match the name on the identification card provided by the driver, Deputy Roth asked the driver about the registered owner of the vehicle, and the name of the person who had given him permission to use the vehicle. The driver could not recall or did not know. The deputy then asked Defendant if the car belonged to him. Defendant indicated that it did not.

{6} Deputy Roth asked the driver and Defendant about their travel plans. Although he could not remember their responses with specific detail, viewing the evidence in the light most favorable to the State the driver said they were traveling to Albuquerque to visit an uncle, while Defendant said they were traveling to Colorado for work. Deputy Roth thought that Defendant and the driver gave conflicting travel plans.

{7} Deputy Roth returned to his patrol unit to prepare a speeding citation. He also initiated a wants-and-warrants check on both the driver and Defendant and checked the vehicle's status. The deputy was informed that there were no outstanding warrants and that the vehicle had not been reported stolen. Remaining suspicious, he prepared a consent-to-search form and requested the assistance of a canine unit.

{8} Deputy Roth presented the speeding citation to the driver and returned his paperwork. He then asked the driver if there were any drugs in the car. The driver indicated that there were not. Deputy Roth then asked for permission to search the vehicle. The driver agreed and proceeded to read, initial, and sign a consent-to-search form. Deputy Roth also obtained Defendant's verbal and written consent to search.

{9} The canine unit arrived shortly thereafter. However, the dog did not alert to the vehicle in an appropriate fashion. Instead, it exhibited "unacceptable behavior by biting" rather than scratching or digging. When the handler attempted to correct this behavior, the dog became uncooperative.

{10} At that juncture, officers searched the vehicle. The rear seat was missing. A large stereo speaker system existed in its place, and the officers found a hinged compartment which contained numerous packages of methamphetamine. At this point, approximately fifty minutes after the traffic stop was initiated, both the driver and Defendant were arrested.

## Discussion

{11} Defendant contends that he was detained in violation of the Fourth Amendment, which rendered the ensuing search of the vehicle invalid. A two-part analysis is typically applied to issues of this nature. *See State v. Duran*, 2005–NMSC–034, ¶ 23, 138 N.M. 414, 120 P.3d 836. First, we consider whether Deputy Roth's action was justified at its inception. *Id.* Second, we must determine whether the officer's conduct was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* Expansion of the scope of inquiry is only permitted if the officer had a reasonable, articulable suspicion that other criminal activity may have been afoot. *Id.*

{12} In this case, the first prong of the analysis is not in dispute. Deputy Roth's observation of the speeding violation provided a sufficient basis for him to stop the car and to request license, registration, and proof of insurance. *See State v. Romero*, 2002–NMCA–064, ¶ 9, 132 N.M. 364, 48 P.3d 102 ("After stopping [the d]efendant for speeding, [the o]fficer ... could lawfully detain [the d]efendant to inspect his license, proof of registration, and insurance."). We therefore turn to the second prong.

{13} Because the driver lacked a valid driver's license and the name on the vehicle registration did not match the name on the driver's identification card, and because there was an obvious masking odor present, Deputy Roth inquired about the driver's authorization to use the vehicle. To the extent that this represented an expansion of the inquiry, it was permissible. *See State v. Van Dang*, 2005–NMSC–033, ¶ 15, 138 N.M. 408, 120 P.3d 830 (observing where the driver's name did not appear on a rental contract, the officer had a right to investigate whether the

driver was authorized to operate the vehicle); *Romero*, 2002–NMCA–064, ¶ 12, 132 N.M. 364, 48 P.3d 102 ("Once [the d]efendant was unable to produce ... indicia of lawful possession ... [the law enforcement officer] reasonably could have suspected that the car might be stolen.").

{14} When the driver was unable to provide the name of either the registered owner of the vehicle or the person who had given him permission to use the vehicle, Deputy Roth asked both the driver and Defendant about their travel plans. Although Defendant contends that this was improper, prior decisions indicate that Deputy Roth's questions were permissible under the circumstances. *See Van Dang*, 2005–NMSC–033, ¶¶ 1, 15, 138 N.M. 408, 120 P.3d 830 (holding that questioning of driver and passenger about their travel plans was permissible, as a part of an investigation into the driver's authorization to use the vehicle and whether it was stolen); *Duran*, 2005–NMSC–034, ¶¶ 37–38, 138 N.M. 414, 120 P.3d 836 (holding that "strange or suspicious circumstances surrounding the initial justification for the traffic stop," including a strong odor emanating from the vehicle and an irregular bill of sale, provided grounds for the officer to ask the driver and passenger about their travel plans).

{15} While preparing the speeding citation, Deputy Roth learned that there were no outstanding wants or warrants, and the vehicle had not been reported stolen. He nevertheless requested a canine unit, inquired about the presence of drugs, and obtained consent to search the vehicle. Defendant contends that this was improper, on grounds that the results of the wants-and-warrants inquiry, as well as the report on the status of the vehicle, should have quelled Deputy Roth's suspicions. We disagree.

{16} Deputy Roth testified that he became suspicious about the presence of drugs based on: (1) the strong odor of air freshener, heavy perfume, or after shave emanating from the vehicle, which Deputy Roth stated in his experience is frequently used by traffickers to conceal the odor of narcotics; (2) the driver's inability to produce a valid driv-

er's license; (3) the strange situation with regard to the ownership and registration of the vehicle, including the driver's inability to identify the source of authorization to operate the vehicle; (4) the driver's excessive nervousness; and (5) the apparent inconsistencies in the descriptions of their travel plans.

{17} If Deputy Roth's suspicions had only concerned the status of the vehicle, it would have been improper to continue the detention. *See State v. Jutte,* 1998–NMCA–150, ¶¶ 5, 19–20, 126 N.M. 244, 968 P.2d 334 (holding that protracted detention while awaiting a canine unit was improper, where the national theft report was negative, and the officers had no reasonable, articulable basis for their suspicion of drugs). However, Deputy Roth testified as to his suspicions of drug-related activity, and to the extent that his suspicion was articulable and reasonable, the expanded inquiry was permissible. *See State v. Lowe,* 2004–NMCA–054, ¶ 12, 135 N.M. 520, 90 P.3d 539 (observing that inquiry about drugs or alcohol in the course of a routine traffic stop is permissible "if the officer has reasonable, articulable suspicion that the motorist possesses or is under the influence of illicit drugs or alcohol").

{18} The deputy's perceptions and observations in the present case are analogous to circumstances which have previously been held sufficient to support the expansion of routine traffic stops into the investigation of drug-related offenses. In *Van Dang,* the New Mexico Supreme Court held that suspicious circumstances surrounding the driver's alleged permissive use of a rental vehicle, the driver's nervousness, and inconsistent descriptions of travel plans were sufficient to support expansion of the investigation such that the officer was justified, based on his experience and training, in inquiring about the presence of drugs and seeking permission to search the vehicle. 2005–NMSC–033, ¶¶ 1, 5, 16, 138 N.M. 408, 120 P.3d 830. Similarly, in *Duran,* the Court held that circumstances including travel along a known drug-courier route, strange tools in the back of the car, a suspicious odor, an irregular bill of sale, an uncommon degree of nervousness, and conflicting accounts of travel plans were

sufficient to support inquiry about the presence of drugs and to justify a request for consent to search the vehicle. 2005–NMSC–034, ¶ 38, 138 N.M. 414, 120 P.3d 836. Although the litany of suspicious circumstances in the present case differs in some of its particulars from the suspicious circumstances addressed in *Van Dang* and *Duran,* those cases persuade us that the totality of the circumstances supplied an articulable and reasonable basis for Deputy Roth's inquiry about drugs and justified his request for consent to search the vehicle. *See Van Dang,* 2005–NMSC–033, ¶ 16, 138 N.M. 408, 120 P.3d 830; *Duran,* 2005–NMSC–034, ¶ 40, 138 N.M. 414, 120 P.3d 836.

{19} Defendant further argues that the detention was so prolonged in this case that it tainted the consent and rendered the search improper. In this regard, Defendant contends both that the deputy's lack of diligence invalidated his actions and that the duration of the detention transformed the encounter into an impermissible de facto arrest. *See generally State v. Robbs,* 2006–NMCA–061, ¶ 27, 139 N.M. 569, 136 P.3d 570 (observing that "the duration of a stop is a factor in determining reasonableness"); *State v. Snyder,* 1998–NMCA–166, ¶ 23, 126 N.M. 168, 967 P.2d 843 (observing that a prolonged investigatory detention may ripen into a de facto arrest); *Jutte,* 1998–NMCA–150, ¶¶ 22–23, 126 N.M. 244, 968 P.2d 334 (holding a consent to search to be tainted by an unreasonable detention resulting in an unlawful de facto arrest). We will address both underlying arguments concurrently because both rest on the same underlying premise, an impermissibly protracted detention.

{20} There is no bright-line rule establishing a time frame within which a detention becomes impermissibly protracted or invasive. *See State v. Hernandez,* 1997–NMCA–006, ¶ 23, 122 N.M. 809, 932 P.2d 499. Instead, a balancing test is applied in which the court weighs the government's justification for the intrusion against the character and significance of the intrusion. *See Robbs,* 2006–NMCA–061, ¶ 21, 139 N.M. 569, 136 P.3d 570; *Jutte,* 1998–NMCA–150, ¶¶ 15–18, 126 N.M. 244, 968 P.2d 334. "The gov-

ernment has a significant interest in preventing the use and distribution of an illegal substance, such as methamphetamine." *Robbs*, 2006–NMCA–061, ¶ 22, 139 N.M. 569, 136 P.3d 570. Insofar as Deputy Roth had a reasonable, articulable suspicion that drug-related criminality was afoot, the justification for the intrusion was substantial.

{21} We turn next to the character and significance of the intrusion. Deputy Roth testified that the interval between the initiation of the stop through issuance of the speeding citation was approximately ten or fifteen minutes; the subsequent conversation, in the course of which Deputy Roth requested consent to search the vehicle, took about five to ten minutes; and their line-by-line discussion of the content of the consent form took approximately five more minutes. Accordingly, viewing the evidence in the light most favorable to the State, the total length of the detention prior to the receipt of written consent to search the vehicle was approximately thirty minutes. The place of detention was approximately ten miles outside Albuquerque city limits, on the roadside, in the early afternoon. Finally, nothing indicates that Defendant was detained in the patrol car or handcuffed.

{22} While we appear to lack authority addressing identical circumstances, we note that the conditions of the detention in this and similar cases are less burdensome than cases in which investigative detentions have previously been classified as de facto arrests or otherwise deemed impermissibly invasive. *Compare Robbs*, 2006–NMCA–061, ¶¶ 29–30, 139 N.M. 569, 136 P.3d 570 (observing that in a case involving reasonable suspicion of illicit drug-related activity, a thirty-five- to forty-minute detention was reasonable, and the investigation was pursued with due diligence), *and Van Dang*, 2005–NMSC–033, ¶ 15, 138 N.M. 408, 120 P.3d 830 (holding that a twenty-five-minute detention while investigating whether a rental vehicle might be stolen was proper), *with State v. Werner*, 117 N.M. 315, 319, 871 P.2d 971, 975 (1994) (holding that a one-hour detention, of which forty-five minutes was spent in the back of a locked patrol car while awaiting identification, constituted an impermissible de facto

arrest), *Jutte*, 1998–NMCA–150, ¶¶ 14–20, 126 N.M. 244, 968 P.2d 334 (holding that a one-hour detention at an inspection checkpoint ripened into an improper de facto arrest where the officers had exhausted the means of investigation by which they could confirm or dispel their suspicions quickly, and where the officers lacked reasonable suspicion that criminal activity was afoot), *Hernandez*, 1997–NMCA–006, ¶¶ 24, 26, 122 N.M. 809, 932 P.2d 499 (holding that a near two-hour detention in a trailer at a border checkpoint constituted an improper de facto arrest), *and State v. Flores*, 1996–NMCA–059, ¶¶ 4, 15, 122 N.M. 84, 920 P.2d 1038 (holding that a two- to three-hour detention in handcuffs at a police warehouse, following a near one-hour roadside detention, constituted an impermissible de facto arrest).

{23} Further, we are unpersuaded that the detention was improperly prolonged while awaiting the canine unit. While investigatory detentions become suspect whenever they entail "awaiting the development of circumstances off the scene," *Werner*, 117 N.M. at 319, 871 P.2d at 975, here Deputy Roth testified that the canine unit, which had been requested during the earlier stages of the traffic stop, arrived within five minutes after Defendant and the driver signed the consent forms. As such, we are not presented with a situation in which a request for canine assistance unduly prolonged the detention. *Compare Robbs*, 2006–NMCA–061, ¶¶ 29–31, 139 N.M. 569, 136 P.3d 570 (holding that a thirty-five- to forty-minute detention while waiting for a canine unit was permissible where the officers had reasonable suspicion and proceeded with due diligence), *with Jutte*, 1998–NMCA–150, ¶ 20, 126 N.M. 244, 968 P.2d 334 (holding that a one-hour detention while awaiting the arrival of a canine unit was impermissible, in light of the fact that the officers lacked reasonable suspicion that drugs were present).

{24} Finally, Defendant argues that the officer's investigation should have ended when the dog failed to alert. This might be arguable if Defendant's description was entirely accurate. *See State v. Neal*, 2007–NMSC–043, ¶ 43, 142 N.M. 176, 164 P.3d 57 (Bosson, J., dissenting) (stating that if a drug

dog fails to alert, a motorist detained on suspicion of a narcotics offense is "free to go"); *Robbs*, 2006–NMCA–061, ¶ 29, 139 N.M. 569, 136 P.3d 570 (observing that the officer's use of a drug dog was a means of investigation that would dispel or confirm their suspicions quickly); *Hernandez*, 1997–NMCA–006, ¶¶ 26, 29, 122 N.M. 809, 932 P.2d 499 (holding that an investigation was improperly continued based on various circumstances, apparently including the fact that a narcotics dog "failed to alert to the presence of drugs"); *Flores*, 1996–NMCA–059, ¶¶ 3, 12–13, 122 N.M. 84, 920 P.2d 1038 (holding, in a case in which the defendant consented to a search, that the search was improperly continued based on various circumstances, including a dog's failure to alert). However, we are not persuaded that the failure to alert in this case necessarily dispelled reasonable suspicion of drugs. While it may be that because of the presumptive probable-cause status given by our courts to a dog alert the State should have a burden to present evidence bearing on the significance and weight to be given to an alert failure. *See State v. Williamson*, 2008–NMCA–096, ¶¶ 17–18, 144 N.M. 522, 188 P.3d 1273 (2008) (Sutin, J., dissenting). In the present case, viewing the evidence in the light most favorable to the State, the evidence showed that the dog was merely uncooperative and its sniff was inconclusive. Furthermore, the dog's conduct does not appear to have dispelled the officer's suspicions, and we see no legal constraint on a continuing "hand search" pursuant to Defendant's consent. Deputy Roth was therefore justified in proceeding to search the vehicle. *See generally Robbs*, 2006–NMCA–061, ¶¶ 24–25, 139 N.M. 569, 136 P.3d 570 (observing that law enforcement officers may use reasonable methods to verify or dispel their suspicions); *State v. Williamson*, 2000–NMCA–068, ¶ 16, 129 N.M. 387, 9 P.3d 70 (observing that, where the officer did not cease the investigation following an inconclusive test, "[d]iligence in conducting an investigation allows a reasonable opportunity to analyze and integrate information received and to consider additional action that may be taken").

{25} In summary, viewing the evidence in the light most favorable to the State, and considering the totality of circumstances, the law enforcement officers conducted a diligent, minimally intrusive investigation, based on a reasonable, articulable suspicion of criminal activity. On balance, "the government's interest in deterring methamphetamine use, coupled with its general interest in effective crime prevention and detection, substantially outweigh[ed] the minimal intrusion on Defendant's liberty" in this case. *Robbs*, 2006–NMCA–061, ¶ 22, 139 N.M. 569, 136 P.3d 570. Because the investigation was conducted in an appropriately circumscribed and diligent fashion, the ensuing consensual search of the vehicle was not tainted by prior illegality. *See Duran*, 2005–NMSC–034, ¶ 42, 138 N.M. 414, 120 P.3d 836. We therefore conclude that Defendant's motion to suppress was properly denied.

## DESTRUCTION OF EVIDENCE

{26} Thirteen packages of methamphetamine were seized from the vehicle in which Defendant was traveling. Although the packages were preserved by the police and presented as evidence in the course of Defendant's first trial, they were destroyed at some point prior to his second trial. Below, Defendant unsuccessfully moved either to dismiss the charges or for the suppression of evidence relating to the packages, based upon the spoliation of this evidence. Defendant challenges the district court's ruling on appeal.

### Standard of Review

{27} We review the district court's decision for abuse of discretion. *See State v. Chouinard*, 96 N.M. 658, 663, 634 P.2d 680, 685 (1981).

### Discussion

{28} It is generally understood that the State has a duty to preserve evidence obtained during the investigation of a crime. *State v. Sanchez*, 1999–NMCA–004, ¶ 7, 126 N.M. 559, 972 P.2d 1150. We apply a three-part test to determine whether deprivation of evidence by the State constitutes reversible error, evaluating whether (1) "[t]he State either breached some duty or intentionally

deprived the defendant of evidence[,]" (2) "[t]he improperly 'suppressed' evidence [was] material[,]" and (3) "[t]he suppression of this evidence prejudiced [D]efendant." *Chouinard*, 96 N.M. at 661, 634 P.2d at 683.

{29} The packages of methamphetamine were destroyed following Defendant's first trial. In his second trial, Defendant moved to dismiss or to exclude evidence based on the deprivation of the methamphetamine. The district court denied Defendant's motion, finding that the destruction of the packages of methamphetamine was negligent and did not prejudice Defendant.

{30} When evidence is lost in a way that does not involve bad faith, the defendant bears the burden of showing materiality and prejudice before sanctions are appropriate. *Id.* at 663, 634 P.2d at 685. "Determination of materiality and prejudice must be made on a case-by-case basis." *Id.* "The importance of the lost evidence may be affected by the weight of other evidence presented, by the opportunity to cross-examine, by the defendant's use of the loss in presenting the defense, and other considerations. The trial court is in the best position to evaluate these factors." *Id.*

{31} Evidence of Defendant's guilt was presented primarily through the testimony of the investigating officers, photographs, and reports. The State's witnesses described with particularity the circumstances surrounding the discovery of the methamphetamine in the vehicle in which Defendant was traveling, the nature of the area behind the front seat, and the nature and quantity of the substance. Defendant failed to show that had the packages of methamphetamine been available they would have undercut the prosecution's case, or how the absence of this evidence materially affected the determination of guilt or innocence. Defendant suggested that the packages were of consequence to the defense only to point out deficiencies in the investigation, such as absence of fingerprint evidence, and to challenge statements by officers of the prevalence of a heavy odor and of a green-tinted powdery substance found in the car and used as a masking agent. However, the State did not present any evidence suggesting that the tinted powder was found on or in the packages themselves or that the packages emitted the same smell as the masking agent. As a result, the physical presence of the packages would have had minimal impeachment value. Furthermore, Defendant was able to cross-examine the State's witnesses at length about the loss of the packages and to argue the significance of their absence to the jury. Defendant also had at his disposal all of the information and testimony relating to the packages of methamphetamine which had been developed in the course of the first trial.

{32} Under these circumstances, we fail to see how the packages themselves could have contributed to the defense in any significant manner. Since we determine that the packages themselves were not material to the defense, we conclude that Defendant failed to establish prejudice. *See State v. Duarte*, 2007–NMCA–012, ¶ 11, 140 N.M. 930, 149 P.3d 1027 (holding that the defendant failed to establish prejudice, where other evidence of guilt was strong, so that the lost evidence did not undercut the prosecution's case; the defense was at liberty to cross-examine about the lost evidence and argue the significance of that testimony to the jury, and the defense had alternative sources of information at its disposal); *Sanchez*, 1999–NMCA–004, ¶¶ 10–14, 126 N.M. 559, 972 P.2d 1150 (holding that the destruction of bags of marijuana seized from the defendant's car did not result in prejudice, where the prosecution stipulated that it would not attempt to introduce any evidence that the bags emitted an odor, where the bulk of the evidence seized was not genuinely in dispute, and where the defense was able to present evidence of the alleged inadequacies in the investigation through cross-examination). As a result, the district court's ruling was not an abuse of discretion.

## EVIDENCE OF DRIVER HAVING ABSCONDED

{33} Defendant contends that the district court improperly excluded evidence of the driver absconding from justice and being the subject of a bench warrant.

## Standard of Review

{34} In general, we review the admission or exclusion of evidence for abuse of discretion. *State v. Armendariz*, 2006–NMSC–036, ¶ 6, 140 N.M. 182, 141 P.3d 526. "An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case." *Id.* We conduct a de novo review of the application of law to facts. *State v. Montes*, 2007–NMCA–083, ¶ 8, 142 N.M. 221, 164 P.3d 102. A district court abuses its discretion when it misapplies or misapprehends the law. *See Rivera–Platte v. First Colony Life Ins. Co.*, 2007–NMCA–158, ¶ 26, 143 N.M. 158, 173 P.3d 765, *cert. granted*, 2007–NMCERT–011, 143 N.M. 157, 173 P.3d 764; *Wilson v. Mass. Mut. Life Ins. Co.*, 2004–NMCA–051, ¶ 21, 135 N.M. 506, 90 P.3d 525.

## Discussion

{35} Defendant attempted to introduce evidence that the driver absconded and that he was the subject of a bench warrant. During the defense questioning of Deputy Roth, the following occurred.

Q. Now, [the driver], you haven't seen him since that day, nearly four years ago, correct?

A. Yes.

Q. And you've been in court proceedings where last year [Defendant] was in attendance, correct?

A. Yes.

Q. And [the driver] wasn't anywhere to be found at that time, correct?

A. No.

Q. And you're aware that he's on Bench warrant status; that he's absconded, correct?

A. I don't know.

[PROSECUTOR]: Your Honor, may we approach the Bench for this?

THE COURT: Yes, you may.

. . . .

[PROSECUTOR]: [Defense counsel] knows better than to be doing that kind of questioning about the—about the driver of this vehicle. It was clear that we weren't going to mention anything about him; yet, he seeks to go there. We can't say anything that he might have said, but [defense counsel] wants to do all of that which he argued against doing.

Additionally, Judge, he's asking this witness to comment on the driver and his legal status, and I don't think he's competent to do that, but secondly, Judge, we've already asked the jury to disregard all of that information and concentrate only on one thing. So it's not even relevant to what we're here for. That's part of the objection, I think.

THE COURT: Okay. Response.

[DEFENSE]: Well, there's a number of things that come to mind, and let me make sure I list them all. . . . Number three, we have not said that nothing can come in about [the driver]. Over my objection they have introduced this ticket, which is a statement by him. I'm not talking about a statement by [the driver]. I'm talking about his absence from this trial and all these proceedings, and number four, there's an abundance of case law that says flight is evidence of consciousness of guilt, and that's our defense. The guilty man took off and isn't here. He was the trafficker of the drugs.

Defense counsel argued that it was relevant that "[t]he guilty party flees from justice." The court sustained the prosecutor's objection and gave a cautionary instruction to the jury to "disregard the last question and statement made by this witness regarding the co-defendant or the other individual in this matter." The court ruled that the evidence was not relevant and also that it was too speculative because there was no evidence showing as to the reason for the driver's absence.

{36} On appeal, the State argues that the district court properly excluded evidence of the driver's flight because Defendant did not explain why the driver had disappeared. We disagree. Our decisions have not required the prosecution to establish a defendant's reason for fleeing as a condition to the admission of such evidence against a defendant. In *State v. Rodriguez*, 23 N.M. 156, 166, 167 P. 426, 427, 428–29 (1917), evidence that the defendant escaped from the custody of the

sheriff was admitted in the prosecution's case over the defendant's objection. Our Supreme Court held that the admission of the evidence was not improper. *Id.* Further, the Court adopted the following as the correct statement of the law governing the admission of evidence of flight:

> The flight or concealment of the accused raises no presumption of law that he is guilty, but it is a fact which may be considered by the jury, and from which they may draw an inference, *in connection with other circumstances, and in the absence of an explanation of the reasons or motives which prompted it,* that he is guilty, and evidence of flight or concealment is admissible, whether the other evidence of guilt be direct or circumstantial.

*Id.* at 178, 167 P. at 433 (emphasis added) (internal quotation marks and citation omitted).

{37} In *State v. Hardison*, 81 N.M. 430, 432, 467 P.2d 1002, 1004 (Ct.App.1970), evidence was admitted that two of the defendants had fled from the scene from which insulated copper wire had been taken. The Supreme Court concluded, "There being no explanation of the flight of the two men, the jury may draw an inference of guilt from the unexplained flight." *Id.* In *State v. Trujillo*, 93 N.M. 728, 729, 605 P.2d 236, 237 (Ct.App. 1979), a police officer testified that the defendant had failed to appear for his trial scheduled in September 1977, and that he was apprehended in Utah within "'the past several months'" prior to trial in May 1978. Concerning this evidence, this Court said:

> Defendant contends there must be evidence of consciousness of guilt in order for flight evidence to be admissible. Flight evidence is admissible because that evidence tends to show consciousness of guilt. Consciousness of guilt is an inference that may be drawn from the flight evidence and is not an evidentiary predicate for the admission of flight evidence.

*Id.* (internal quotation marks and citation omitted). In *State v. Baca*, 111 N.M. 270, 277, 804 P.2d 1089, 1096 (Ct.App.1990), this Court stated that not only is flight evidence admissible as proof of a guilty conscience, "[f]light is also admissible as proof of a tacit admission of guilt." Moreover, we concluded that a defendant's knowledge that he was being pursued is not a predicate to the admission of flight evidence. *Id.* at 277–78, 804 P.2d at 1096–97. Since the prosecution is not required to establish the reason for a defendant's flight as a condition to admission into evidence of that defendant's flight, a defendant who desires to introduce evidence of a co-defendant's flight is likewise not required to do so.

{38} The State also argues that evidence of the driver's flight was properly excluded because the evidence did not tend to negate Defendant's guilt and therefore was not relevant to Defendant's theory of defense. Again, we disagree.

> All relevant evidence is generally admissible, unless otherwise provided by law, and evidence that is not relevant is not admissible. Evidence is relevant if it has a tendency to make more or less probable a fact that is of consequence to the determination of the action. Any doubt should be resolved in favor of admissibility.

*State v. Stanley*, 2001–NMSC–037, ¶ 6, 131 N.M. 368, 37 P.3d 85 (citations omitted). As we have indicated, if the driver had been apprehended, and the case had proceeded against Defendant and the driver together, the State would have been allowed to introduce evidence of the driver's flight as evidence of the driver's guilt. However, the State would deprive Defendant of the same opportunity. Defendant's theory at trial was that the driver was solely responsible for the presence of the methamphetamine in the vehicle. Defendant clearly and repeatedly asserted that he had no knowledge of the presence of the drugs, and he presented evidence that he had merely accepted a ride in order to get to Colorado and that the driver controlled the vehicle at all times. Finally, Defendant also pointed out that it was the driver, and only the driver, who was nervous about the traffic stop and ensuing investigation. Defendant was precluded from introducing into evidence the final linchpin of his argument: the driver fled from justice because *he* was *the* guilty one. In fact, the district court specifically instructed the jury

to disregard the evidence that the driver had fled.

{39} Under the circumstances, we cannot conclude that the verdict would have been the same had the jury been allowed to weigh and consider that the driver fled. *See Candoli*, 870 F.2d at 501 (noting that the jury could have viewed the defendant's continued presence as a sign that she did not have a guilty conscience, in contrast to her co-defendant who did flee); *Lobo*, 516 F.2d at 884 (same). In contrast to the case at hand, the defendant in *United States v. Ortland*, 109 F.3d 539 (9th Cir.1997), was permitted to state repeatedly that the co-defendant who fled before trial had left him to answer the charges and that she had " 'dumped it on him.' " *Id.* at 545. The defendant was allowed to do so despite the earlier ruling of the lower court that the parties were not to mention that the absent co-defendant had fled. *Id.*

■ {40} We see no valid rationale for precluding Defendant from attempting to show that only the driver was guilty by (1) establishing the driver's guilty state of mind through circumstantial evidence of his behavior, and (2) contrasting that with Defendant's innocent state of mind through Defendant's behavior, the circumstances, and Defendant's testimony. Given that Defendant relied on his innocence as a defense, the more innocent he could make himself look, the better for his defense. Evidence that would tend to show the driver's behavior and state of mind consistent with guilt in contrast to Defendant's behavior and state of mind consistent with innocence is relevant. In the present case, a conclusion by the jury that only the driver knew of the presence of the drugs in the vehicle would have precluded a finding that Defendant jointly possessed the drugs, and such a finding would have also precluded a finding that Defendant was a co-conspirator with the driver. Defendant was precluded from introducing evidence that tended to support this defense.

{41} From what we have said, we agree with Defendant and conclude that the district court's ruling prejudiced Defendant's right to present a full defense. We therefore hold that the court erred in excluding the evi-

dence relating to the driver's [having absconded] from justice, requiring us to reverse Defendant's convictions.

## SUFFICIENCY OF THE EVIDENCE

■ {42} Defendant challenges the sufficiency of the evidence to support his convictions for possession of methamphetamine with intent to distribute and conspiracy. We address this issue because "Defendant would be entitled to dismissal, instead of retrial, if the evidence at trial were insufficient to support his convictions." *Montes*, 2007–NMCA–083, ¶ 24, 142 N.M. 221, 164 P.3d 102; *State v. Templeton*, 2007–NMCA–108, ¶ 27, 142 N.M. 369, 165 P.3d 1145.

### Standard of Review

{43} In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record to determine whether substantial evidence, either direct or circumstantial, exists such that a rational jury could have found proof beyond a reasonable doubt with respect to every element of the charged offense. *State v. Ungarten*, 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App. 1993). "In applying this standard we view the evidence in a light most favorable to the State, resolving all conflicts ... and indulging all permissible inferences in favor of the verdict of the jury." *Id.* "We do not substitute our judgment for that of the jury or reweigh the evidence." *Montes*, 2007–NMCA–083, ¶ 26, 142 N.M. 221, 164 P.3d 102.

### Discussion

{44} The State presented evidence that Defendant was a passenger in a red, two-door hatchback Mazda sports car carrying a large quantity of methamphetamine. An apparent, masking agent emitting an odor had been applied inside the vehicle. The odor smelled something like air freshener, a heavy perfume, or after shave. A green-tinted powdery substance appearing to be the masking agent was under the mats on both the passenger's and driver's side of the car, and the same green tint was visible "all over" Defendant's shirt. Additionally, the back seat had been removed and a large stereo

system had been substituted presumably in order to create a "trap door" or compartment in which the methamphetamine was concealed.

{45} Finally, Defendant gave statements in his police interviews and in his later testimony that were conflicting in regard to travel plans and the persons involved in providing for his ride. The jury heard from the officers that Defendant stated that Luis Alvarez was his brother-in-law and was known as Chava, and that Luis Alvarez suggested that Defendant ride in the Mazda. The jury also heard from the officers that Defendant stated he would be traveling to possibly Alabama and then to Colorado. Defendant testified that he did not say these things to the officer. He asserted that his brother-in-law was Francisco Alvarez and that Luis Alvarez had passed away before the incident in question. He also testified that Salvador Alvarez was known as Chava, that Salvador was his brother-in-law's brother, that it was Salvador who offered him a ride, and that he was not going to Alabama before going to Colorado. Further, Defendant testified that a second vehicle carrying Chava and two others was also traveling along with the Mazda and that he overheard that all were going to Alabama.

{46} The foregoing evidence, viewed in the light most favorable to the verdicts, is sufficient to support the convictions for trafficking and conspiracy. *See State v. Hernandez*, 1998–NMCA–082, ¶¶ 10–15, 125 N.M. 661, 964 P.2d 825 (upholding a conviction for possession with intent to distribute where drugs were discovered in a hidden compartment in a vehicle, based on specific odors commonly used to mask the smell of drugs, physical alterations to the vehicle which should have been apparent to the defendant, and a series of inconsistent statements made by the defendant to investigating officers); *see generally State v. Barber*, 2004–NMSC–019, ¶ 28, 135 N.M. 621, 92 P.3d 633 (holding that evidence establishing connection between drugs and an accused may be relied upon to establish an inference of control); *State v. Donaldson*, 100 N.M. 111, 118–19, 666 P.2d 1258, 1265–66 (Ct.App.1983) (stating that proof of possession of a large quantity of a controlled substance is sufficient proof of

trafficking); *State v. Johnston*, 98 N.M. 92, 95, 645 P.2d 448, 451 (Ct.App.1982) (observing that conspiracy is rarely susceptible of direct proof and that circumstantial evidence is sufficient to support a conspiracy conviction).

## CONCLUSION

{47} For the foregoing reasons, we reject all but one of Defendant's assertions of error. We reverse Defendant's convictions based on the erroneous exclusion of evidence that the driver absconded and remand for further proceedings.

{48} **IT IS SO ORDERED.**

WE CONCUR: RODERICK T. KENNEDY and MICHAEL E. VIGIL, Judges.